NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| _____ | : | |
| NORTHFIELD CITY BOARD OF | : | |
| EDUCATION, | : | |
|  | : | |
| Plaintiff, | : | Civil No. 19-9582 (RBK/KMW) |
|  | : | |
| v. | : | **OPINION** |
|  | : | |
| K.S. *on behalf of L.S.*, | : | |
|  | : | |
| Defendant. | : | |
| _____ | : | |

**KUGLER**, United States District Judge:

This matter comes before the court upon the Motion for Summary Judgment (Doc. No. 13) filed by Plaintiff Northfield City Board of Education (the "District") and the Motion for Summary Judgment (Doc. No. 14) filed by Defendant K.S. The case arises as an appeal from the Final Decision of Administrative Law Judge ("ALJ") Catherine A. Tuohy (Doc. No. 13-6 ("HD")) in K.S.'s action against the District pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Both the District and K.S. now seek to overturn portions of the ALJ's decision. For the reasons set forth below, the District's Motion is **GRANTED**, K.S.'s Motion is **DENIED**, and the ALJ's decision is **AFFIRMED IN PART** and **REVERSED IN PART**.

## I.     BACKGROUND

K.S. is the mother of L.S. (HD at 3). L.S. is emotionally fragile and has a history of trauma, having been molested by her step-brother at the age of seven. (Doc. No. 15-1 at 8–9). She also has a history of self-harm, as she has been cutting herself since the age of eight. (*Id.* at 12–13). During

the time of events in question, L.S. lived with K.S., K.S.'s partner, C.O., and C.O.'s three children. (Doc. No. 17-1 at 112–13).[1]

### A. L.S.'s Experience in the Northfield City School District

In September 2016, L.S. began attending school within the District as a fifth-grade student at the Northfield City Middle School. (HD at 4). At the time she was nine years old. (*Id.* at 4). By October, K.S. and C.O. noticed that L.S. seemed withdrawn, and was having a hard time completing her homework, especially for math, a subject with which she has always struggled. (Doc. No. 15-1 at 15;Doc. No. 17-1 at 95). As such, on October 11, 2016, K.S. emailed L.S.'s math teacher, Denise Zuccarino, to see if there was any additional math support available for L.S., such as after-school tutoring. (Doc. No. 18 at 2). Zuccarino responded that she was available to assist L.S. anytime during the school day, upon request, and that she would ask around to see what other resources might be available. (*Id.*)

Also on October 11, K.S. emailed the school's guidance counselor, Lisa Harvey, complaining about an incident where another student told L.S. to "kill herself" and L.S. responded that "he shouldn't tell 'suicidal' people that." (*Id.* at 3). K.S. disclosed to Harvey that L.S. had a history of self-harm. (*Id.*). On November 2, 2016, K.S. emailed L.S.'s English and Language Arts ("ELA") teacher, Linda Doyle, raising several concerns about L.S., including that L.S. was having difficulty adjusting to her new school, was being bullied by other students, and was turning in incomplete assignments. (*Id.* at 4). K.S. mentioned that L.S. had a "history of trauma." (*Id.*).

On November 4, 2016, K.S. again emailed Zuccarino about L.S.'s struggles with math. (*Id.* at 6). On November 13, 2016, K.S. emailed another math teacher, Raina Nash, about tutoring L.S. (*Id.* at 7).

---

[1] The step-brother who molested L.S. is not one of C.O.'s children.

On January 13, 2017, Doyle and K.S. exchanged several emails about a story L.S. had written for class entitled "The World Painted in Blood." (*Id.* at 10–11). As is typical of stories written by fifth graders, this story is somewhat difficult to follow, but based on what is available to the Court, it mostly concerns the narrator's strained relationship with her mother and her concern about being sent to boarding school. (*Id.* at 11–12). Despite its graphic title, the story does not feature any notable violence, other than a brief discussion of a schoolyard scuffle involving the narrator's sister. (*Id.*).

K.S. informed Doyle that she would mention the story to L.S.'s therapist and had contacted Harvey to ask for assistance. (*Id.* at 10–11). In a later email, K.S. reassured Doyle that L.S. had "started her story over again, but don't worry, there will still be dead parents! : )." (*Id.* at 9). L.S.'s therapist, Barbara Lamb, told K.S. that it was "quite an interesting story" and that it "says a lot about [L.S.'s] inner perspective on the world and herself in it." (*Id.* at 17).

On January 31, 2017, K.S. sent an email to Janis Albrecht, the Child Study Team ("CST") Secretary, requesting an evaluation of L.S. (Doc. No. 13-7 at 2). On February 1, 2017, Vicky Georges, the school psychologist, invited K.S. to attend a meeting scheduled for February 27, 2017, to decide whether to evaluate L.S. for a disability requiring special education and related services. (Doc. No. 13-8 at 2–3).

K.S. attended the February 27, 2017 meeting. (Doc. No. 13-9 at 2). At the meeting, K.S. informed the District personnel present that L.S. had struggled with suicidal ideation in the past. (Doc. No. 15-1 at 64). Based on what was discussed at the meeting, the CST found that L.S. was displaying "emotional concerns," could be "oppositional defiant," struggled with math, and was currently taking Prozac for depression. (Doc. No. 13-10 at 2–3). However, the CST also found that L.S. did have some friends at school, was doing well in her classes other than math, and that she

was making a sincere effort to succeed in math. (*Id.*). As such, the CST concluded that a disability evaluation was not warranted, instead referring L.S. to Intervention and Referral Services ("I&RS") and recommending that L.S. see a pediatrician for an Attention Deficit Disorder ("ADD") or Attention Deficit and Hyperactivity Disorder ("ADHD") diagnosis. (*Id.* at 3).

On March 9, 2017, K.S. sent an email to the CST expressing dissatisfaction with the outcome of the February 27 meeting. (Doc. No. 18 at 30). On March 10, 2017, Brooke Parsons, the school's learning-disabilities teacher consultant, responded to K.S. (*Id.* at 31). Parsons informed K.S. that the I&RS team was developing an intervention plan for L.S., which would include daily check-ins with the school's social worker, Kim Zaretsky, to summarize how the school day went. (*Id.*). Parsons also encouraged K.S. visit a doctor for a possible ADD or ADHD diagnosis for L.S. (*Id.*).

Pursuant to the I&RS referral, Zaretsky provided counseling to L.S. from February 28, 2017 through December 14, 2017.[2] (Doc. No. 19-1). On March 23 and 24, 2017, Zaretsky observed that L.S.'s depression had worsened, and noted that L.S. complained that other students were making inappropriate comments to her, although L.S. refused to provide any of their names. (*Id.* at 2–3). She also recorded that L.S. told her that she was cutting her arms and stomach superficially with a paperclip. (*Id.* at 3). K.S. informed Zaretsky that she was aware of this cutting behavior and that it had occurred in the past. (*Id.*). Zaretsky also contacted Lamb about L.S.'s behavior. (*Id.*). Lamb agreed with Zaretsky that a higher level of treatment would be beneficial for L.S. (*Id.*).

On April 3, 2017, Zaretsky recorded that L.S. appeared very depressed, leading Zaretsky to conclude that L.S. needed to be evaluated immediately. (*Id.* at 4). As such, Zaretsky met with K.S. and L.S. to discuss her concerns for L.S.'s safety. (*Id.*). From April 6 through April 10, 2017,

_____

[2] Zaretsky did not have any sessions with L.S. during the summer of 2017 when school was not in session.

L.S. was admitted to an in-patient psychiatric unit at a hospital because she expressed suicidal ideation. (HD at 5). Due to L.S.'s hospitalization, on April 11, 2017, Georges sent K.S. a letter inviting her to a May 8, 2017 meeting with the CST to discuss L.S.'s educational and emotional needs. (Doc. No. 13-11 at 2). Also on April 11, a meeting was held with the school principal, Zaretsky, L.S., and K.S. to discuss L.S.'s return to school. (HD at 5). The parties developed a safety plan for L.S. that included allowing her to eat lunch alone in the library if she so chose, daily counseling with Zaretsky as needed, adjusting her schedule to allow her to attend outside therapy, allowing her to skip gym class, and allowing her to arrive to her classes a few minutes late so that she could travel when the hallways were less crowded. (*Id.* at 5–6). L.S. returned to school on April 24. (*Id.*).

During her April 3 counseling session with Zaretsky, L.S. revealed the names of students she claimed had been harassing her since October 2016. (Doc. No. 19-1 at 4). In response, the school initiated a Harassment, Intimidation, and Bullying ("HIB") investigation. (Doc. No. 18 at 48). The investigators interviewed the students L.S. identified as perpetrators and two students she identified as witnesses, but none of the interviewees corroborated L.S.'s claims. (Doc. No. 23 at 2). As such, the investigators concluded that this was not an incident of HIB. (*Id.* at 4).

At the May 8 meeting, the CST determined that a disability evaluation of L.S. was warranted. (Doc. No. 13-14 at 2). On May 9, 2017, the District invited K.S. to attend a meeting on June 12, 2017, to determine if L.S. was eligible for an individualized educational program ("IEP") and, if L.S. was eligible, to develop an IEP for her. (Doc. No. 13-15).

On May 10, 2017, Zaretsky conducted a social evaluation of L.S. (Doc. No. 13-16). Zaretsky noted that L.S.'s in-class behavior could be challenging, that she was struggling with anxiety and depression, and that she was not doing well in math. (*Id.* at 2–3). Zaretsky also

recorded L.S.'s sexual abuse at the hands of her step-brother. (*Id.* at 3–4). On May 17, 2017, Brooke Parsons, Learning Disabilities Teacher-Consultant, conducted a learning evaluation of L.S. (Doc. No. 13-17). Based on this evaluation, Parsons concluded that there were no significant concerns with L.S.'s academic performance, except for some weakness in math. (*Id.* at 11).

On May 24, Georges conducted a psychological evaluation of L.S, which included administering the Wechsler Intelligence Scale for Children-Fourth Edition ("WISC-IV"). (Doc. No. 13-18). On the WISC-IV, L.S.'s Verbal Comprehension score was 112, placing her in the high-average range; her Perceptual Reasoning score was 104, placing her in the average range; her Working Memory score was 102, placing her in the average range; her Processing Speed score was 97, placing her in the average range; and her Full Scale IQ score was 107, placing her in the average range. (*Id.* at 3). Georges also administered the Bender-Gestalt Test for Children, which calculated L.S.'s developmental age equivalent as 5 years 6 months to 5 years 8 months. (*Id.* at 4). However, Georges noted that many of L.S.'s errors were due to "excessive erasing, shading, and overcorrections." (*Id.* at 5). The District provided K.S. with copies of Zaretsky's, Parsons's, and Georges's evaluations prior to the June 12 IEP meeting. (Doc. No. 13-19).

K.S. and District personnel attended the June 12 meeting.  (Doc. No. 13-20). At the meeting, the District determined that L.S. was "emotionally disturbed" and was therefore eligible to receive special education and related services. (Doc. No. 13-21). The District also developed an IEP for L.S. (Doc. No. 13-22). The IEP noted that L.S.'s emotional needs were impeding her learning and thus required specialized intervention. (*Id.* at 6). As such, the IEP called for a variety of modification to L.S.'s educational environment, including a daily pull-out resource math class. (*Id.* at 9–10). K.S. consented to and signed this IEP. (*Id.*). However, the parties agreed not to implement it immediately because there were only a handful of days left in the school year. (Doc.

No. 23-1 at 7). Rather, they agreed that the IEP would not go into effect until the start of the 2017–18 school year. (*Id.*; Doc. No. 13-22 at 2).

For the 2016–17 school year, L.S.'s final grades were: Math, C; Health, B; Spanish, B+; ELA, A-; Science, C; Social Studies, B+. (Doc. No. 17 at 128–29). Out of the 180 days in the school year, L.S. had 27 unexcused tardies and 14.5 unexcused absences. (*Id.* at 132–33). During the first marking period, she had a B in math, in the second, a C, in the third, a D-,  and in the fourth a C. (Doc. No. 24-2 at 36).

On July 6, 2017, Dr. Thomas C. O'Reilly completed a psychiatric evaluation of L.S.; K.S. had consented to this evaluation at the May 8 meeting. (*Id.*). The parties received this report on or about August 6, 2017. (*Id.*). In his report, Dr. O'Reilly stated that L.S. has "oppositional and defiant behaviors," and diagnosed her with posttraumatic stress disorder, depressive disorder, and social anxiety disorder. (Doc. No. 13-24 at 3, 7). Amongst other things, Dr. O'Reilly recommended that the District monitor L.S. for symptoms of ADHD, provide an aide to shadow L.S. and have L.S. meet with the CST to ensure appropriate interactions with her peers, and consider modifying L.S.'s schedule to allow her receive homebound instruction for part of the day. (*Id.* at 7).

On September 12, 2017, the District held a follow-up IEP meeting, with K.S., her lawyer, and District personnel in attendance. (Doc. No. 13-26 at 2). L.S. was again classified as "emotionally disturbed," making her eligible for special education and related services. (Doc. No. 13-27 at 2). Further, the District developed a new IEP. (Doc. No. 13-28). Like the June 12 IEP, this IEP provided a daily pull-out resource class for math. (*Id.* at 12). The September 12 IEP also placed L.S. in a daily study skills class for students with disabilities, and a daily session for behavioral intervention services. (*Id.*). The IEP additionally provided L.S. with two personal aides, who would each cover one-half of the school day, and offered her two counseling sessions per

week. (*Id.*). Further, the IEP contained a number of modifications to L.S.'s classroom environment, including allowing her extra time to complete assignments, allowing her to use a calculator, providing her with constant praise to boost her self-esteem, and supervising her to avoid contact with students who had triggered emotional distress in the past. (*Id.* at 11). K.S. did not consent to implementation of the September 12 IEP. (*Id.*; HD at 9).

The District did not implement the June 12 IEP during the 2017–18 school year, meaning that L.S. remained in general education classes for all her subjects, including math. (Doc. No. 23-1 at 7; 21). However, pursuant to an agreement discussed below, the District did provide L.S. with personal aides to escort her from class to class and to supervise her in-class interactions with other students and teachers. (*Id.* at 14).

### B. Procedural History

On June 29, 2017, K.S. filed a due process complaint against the District with the New Jersey Office of Special Education Programs, challenging, among other things, the adequacy of the June 12 IEP. (Doc. No. 13-23). On July 31, 2017, the parties participated in a mediation session before an ALJ in the New Jersey Office of Administrative Law ("OAL"). (HD at 8). The mediation was unsuccessful, and the case was transferred to the OAL for further proceedings. (*Id.*; HD at 8).

On August 31, 2017, the parties met for a settlement conference before ALJ Susan A. Scarola. (Doc. No. 13-25). At the settlement conference, the following exchange took place:

> THE COURT: Okay, very good. All right, so we tried to see if this matter can be resolved. Apparently it can't be resolved in its totality but the parties have at least agreed to an interim order which essentially is to provide the child with a one to one aide starting with the first day of school and the parties are going to then review the new psychiatric report and have an IEP meeting on September 12th, correct?
>
> MR. KALAC: The only clarification to that, Judge, is that this child is—it's an initial IEP so what we have starting in the beginning of the year is the child— because we don't have consent from the parents for the implementation of the initial

IEP so we're starting the year the child is a regular ed student, so, this one to one aide is being offered as an education courtesy until the parties—

THE COURT: Expecting that she would, in fact be classified.

MR. KALAC: Correct.

THE COURT: Okay.

MR. FLYNN: Just if I may quickly clarify, Your Honor, just to be clear, this is the IEP that was developed, we're revisiting an IEP that was developed as of the end of June so it's not quite as initial, just to be clear on that.

THE COURT: Well, it's initial since none has been signed yet, so there's nothing in effect, that's—

MR. KALAC: Right, it's as initial as initial can be.

MR. FLYNN: I believe—

THE COURT: Well, not quite because there could be—there could be none. So—

MS. S.: No, pardon me, Your Honor, I did sign the IEP but it wasn't complete because the psych eval was pending and that wasn't done until July.

THE COURT: Okay.

MS. S.: So it was incomplete.

THE COURT: It's still an initial IEP. All right, so I expect everybody will comply with that and then hopefully you'll be able to resolve it, and if not, Judge Hughes will have the case, so, thank you.

(Doc. No. 13-25 at 5–7). Under the interim order entered by ALJ Scarola, the District was required to provide a one-to-one aide to L.S. and continue individual counseling services. (HR at 8).

On November 3, 2017, K.S. filed an amended due process complaint, alleging, among other things, that the September 12 IEP was inadequate. (Doc. No. 13-29). On December 14, 2017, K.S.'s counsel sent ALJ Tuohy a letter request for additional forms of relief, including a functional behavioral assessment ("FBA") and reimbursement for expert fees. (HR at 9). Hearings were held on January 8, January 10, January 12, February 1, February 9, March 1, March 6, and March 16,

2018 to take testimony from witnesses. (HD at 3). Testifying for the District were Zaretsky, Chelsey Ingram and Jennifer Turon, L.S.'s personal aides during her sixth-grade year, Doyle, and Kristen Polak, L.S.'s sixth grade ELA teacher. Testifying for K.S. were Parsons, Harvey, C.O., K.S., and Janice Wills-Kingsbury, K.S.'s expert.

There was extensive testimony at the hearing about L.S.'s demeanor and behavior at school. Zaretsky testified that she has not observed any of the depressive behavior that L.S. exhibited in the lead up to her hospitalization in April 2017 since the start of the 2017–18 school year. (Doc. No. 24-2 at 18). She also discussed an incident where L.S. misinterpreted a classmate's joking suggestion that L.S. should drink bleach as a serious charge that she should kill herself. (*Id.* at 20–21). Zaretsky stated that L.S. regularly swears during counseling, but that L.S. did not otherwise swear during school. (*Id.* at 112–13). Further, she described L.S. as resisting teachers' instructions during class. (*Id.* at 88).

Ingram testified that L.S. occasionally tells her to "shut up," and that she has observed L.S. making sarcastic remarks during class. (Doc. No. 23-1 at 37). However, Ingram does not believe that these behaviors impact the learning of other students. (*Id.* at 39–40).

Turon testified that L.S. strongly dislikes math and frequently puts herself down during math class. (*Id.* at 105). At the same time, L.S. participates in her science and social studies classes, where she does not make the same sort of self-disparaging comments as she does in math. (*Id.* at 109). Occasionally, L.S. will tell her classmates to "shut up" if they are being noisy, but Turon believes that L.S.'s behavior does not disrupt the other students' learning. (*Id.* at 110, 132). Turon has not observed other students bullying L.S. (*Id.* at 133).

Doyle testified that L.S. displayed erratic behavior in class—some days she would be very happy, while other days she would be quite solemn. (Doc. No. 21-2 at 23). Further, on certain days

she would be engaged with the class, while on other days she would not participate. (*Id.*). Doyle indicated that when L.S. did participate, she was at grade level, and that her writing skills are excellent. (*Id.* at 24). Over the course of the 2016–17 school year, L.S. grew moodier and less willing to participate in class. (*Id.* at 26–27). Despite these behaviors, L.S. never meaningfully disrupted the other students or the operation of the class. (*Id.* at 27). L.S. switched ELA classes in April of 2017; her new section had more girls, and L.S.'s behavior improved. (*Id.* at 31). Doyle opined that L.S. was able to handle the academic rigor of the general education fifth-grade ELA class. (*Id.* at 32).

Polak testified that L.S. often makes comments expressing self-doubt but finds that L.S.'s overall behavior is typical for her age-group. (Doc. No. 21-2 at 79–80). She noted that L.S. is a very creative writer and her academic performance is satisfactory. (*Id.* at 81–82). However, L.S. did occasionally write stories with mature themes that were inappropriate for a school setting, including a story that implied a sexual relationship between an adult and a child. (*Id.* at 82, 95). Polak opined that L.S. was able to handle the academic rigor of the general education sixth-grade ELA class. (*Id.* at 86).

ALJ Tuohy issued her decision on January 28, 2019. (HD at 2). She first found that the District provided L.S. with a free and appropriate public education ("FAPE") under the IDEA because the September 12 IEP was adequate to meet her education needs. (*Id.* at 72–73). Next, she rejected K.S.'s request for an FBA and found that the District had met its obligation under the IDEA's child-find requirement to timely identify L.S. as requiring special education services. (*Id.* at 73–76). However, she found that the District had violated the IDEA's "stay-put rule" by failing to implement the June 12 IEP, concluding that L.S. is thereby entitled to compensatory education for math instruction. (*Id.* at 77). Finally, ALJ Tuohy found that L.S. was not entitled to an out-of-

district placement, nor was K.S. entitled to reimbursement of the fees incurred by hiring Kingsbury as an expert. (*Id.* at 78–79).

### C.  Proceedings Before This Court

On April 11, 2019, the District filed its Complaint (Doc. No.1) before this Court, seeking reversal of ALJ Tuohy's determination that  L.S. is entitled to compensatory education for math instruction and affirmance of the remainder of her decision. On June 14, 2019, K.S. filed her Answer (Doc. No. 5), and on June 17 filed a Counterclaim (Doc. No. 7) seeking reversal of ALJ Tuohy's determination that the District did not violate the IDEA's child find provision, reversal of the determination that the District did not deny L.S. a FAPE, and reversal of the failure to make a determination that the District retaliated against K.S. in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.[3]

On October 25, 2019, the District and K.S. each filed motions for summary judgment. On November 4, 2019, they each filed Opposition briefs (Doc. Nos. 28, ("K.S. Opp."), 29 ("Dist. Opp.")), with Replies following on November 12 (Doc. Nos. 31 ("Dist. Reply"), 32 ("K.S. Reply")). As such, the matter is fully briefed and ripe for decision.

## II.    THE IDEA STATUTORY FRAMEWORK

In exchange for federal funding, the IDEA requires states to guarantee a FAPE to all children with disabilities. 20 U.S.C. § 1412(a)(1). The IDEA recognizes the following disabilities:

> [I]ntellectual disabilities, hearing impairments (include deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities.

---

[3] The Counterclaim also alleges that ALJ Tuohy erred by failing to find that the District discriminated against L.S. in violation of Section 504 and Title IX, 20 U.S.C. § 1681. But as K.S. does not reference these claims in any of her briefing, the Court assumes that she has abandoned them, and therefore does not address their merits.

20 U.S.C. § 1401(3)(A)(i). This case concerns a child with "emotional disturbance," which means a condition adversely effecting a child's performance that displays at least one of the following characteristics:

(1) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(2) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(3) Inappropriate types of behavior or feelings under normal circumstances.

(4) A general pervasive mood of unhappiness or depression.

(5) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. 300.8(c)(4)(i).

A FAPE "consists of educational instruction specially designed to meet the unique need of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982). If the state is unable to provide a FAPE, the state must compensate the child's parents for the cost of attendance at a private school that can. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012).

To provide a FAPE, "school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student." *Id.* The IEP "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)). "Although the IEP must provide the student with a basic floor of opportunity, it does not have to provide the optimal level of services, or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (internal quotation omitted). Rather, the IEP "must be reasonably

calculated to enable the child to receive meaningful education benefits in light of the student's intellectual potential and individual abilities." *K.D. ex rel. Dunn v. Downington Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (internal quotation omitted) (emphasizing that the Third Circuit's test "requires an educational program likely to produce progress, not regression or trivial educational advancement" (internal quotation omitted)).

Further, the IDEA requires that students with disabilities are to be educated in the "least restrictive environment." 20 U.S.C. § 1412(a)(5)(A); *see Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995) (explaining that "[t]he least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled"). Accordingly, the Third Circuit has "interpreted this mandate to require that a disabled child be placed in the least restrictive environment . . . that will provide him with a meaningful educational benefit." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000).

Parents may challenge the adequacy of an IEP by seeking an administrative "impartial due process hearing." 20 U.S.C. § 1415(f). At this hearing, all parties have "the right to counsel, the right to present evidence, and the right to cross-examine witnesses." *Ridley*, 680 F.3d at 270. "Any party aggrieved by the findings and decision" made at the administrative due process hearing may appeal that decision in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

## III.    STANDARD OF REVIEW

When reviewing an administrative determination in an IDEA case, "the District Court applies a modified version of de novo review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). Thus, "[f]actual findings from the administrative proceedings are to be considered prima facie correct."

*Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). If the district court departs from the ALJ's factual findings, "it is obliged to explain why." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003). Further, if the ALJ heard live testimony, the district court must accept the ALJ's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." *Shore Reg'l*, 381 F.3d at 199 (internal quotation omitted) (noting that "[i]n this context the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court" (internal quotation omitted)).

Unless the parties present new evidence, the district court will decide the case based on the administrative record on a motion for summary judgment. *M.S. v. Randolph Bd. of Educ.*, No. 18-13029, 2019 WL 4785742, at *7 (D.N.J. Sept. 30, 2019) (citing *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003)). Finally, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270.

## IV.   DISCUSSION

There are four main issues before the Court. First, K.S. seeks reversal of ALJ Tuohy's determination that the District did not violate the IDEA's child find requirement. Second, K.S. challenges the ALJ's finding that the District satisfied its obligation to provide L.S. with a FAPE by preparing the September 12 IEP. Third, the District argues that the ALJ erred when she concluded that the District violated the IDEA's stay-put rule by failing to implement the June 12 IEP during the 2017–18 school year. Finally, the parties dispute whether the Court has subject-matter jurisdiction to hear K.S.'s Section 504 retaliation claim.

### A.  Child Find Violation

The IDEA obligates school districts "to identify and evaluate all students who are reasonably suspected of having a disability." *Ridley*, 680 F.3d at 271 (internal quotation omitted); *see* 20 U.S.C. § 1412(a)(3). Each state is responsible for developing procedures to accomplish this "child find" directive. 34 C.F.R. § 300.111. New Jersey's procedures are set forth at N.J.A.C. 6A:14–3.3. Because New Jersey's procedures do not set a firm deadline for school districts to satisfy their child find obligations, the Third Circuit has held that school districts must identify and evaluate students suspected of having a qualifying disability "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007). Under this standard, courts "employ a case-by-case approach and assess whether the school district's response was reasonable 'in light of the information and resources possessed' by the district at a given point in time." *Ridley* 680 F.3d at 272 (quoting *Matula*, 67 F.3d at 501).

Importantly, to violate child find, the school district must have been on notice not only of the student's disability but also of the student's need for special education services. *D.K. v. Abington School Dist.*, 696 F.3d 233, 251 (3d Cir. 2012) (finding no violation where student was achieving "intermittent progress and even academic success in several areas" despite exhibiting disruptive behaviors); *Bd. of Educ. v. Fayette Cty. v. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007) (finding no violation where student was "meeting  expectations" academically even though he was struggling socially and behaviorally). In cases involving mental health disabilities, courts typically only find violations where the school district ignored a marked increase in concerning behavior by the student that was accompanied by a marked decline in academic performance. *See H.D. ex rel. Jeffrey D. v. Kennett Consol. Sch. Dist.*, No. 18-3345, 2019 WL 4935193, at *15–16 (E.D. Pa. Oct.

4, 2019) (finding no violation where student's academic performance declined dramatically from sixth to seventh grade but his anxiety-related symptoms did not manifest in behaviors atypical for middle school students); *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 13-2379, 2015 WL 390864, at *10 (M.D. Pa. Jan. 28, 2015) (finding no child find violation during student's seventh grade year where school district took no action, even though student frequently cried before school and locked himself in the bathroom, his parent informed the school principal that he was suffering from diagnosed anxiety, and he failed three classes); *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 602–03 (M.D. Pa. 2014) (finding child find violation where school district took no action while, over the course of two years, student exhibited increasing signs of depression, cut herself in school, visited the school nurse over 100 times for "moral support," threatened further self-harm and suicide, and began receiving failing or near-failing grades in numerous classes).

K.S. contends the ALJ erred by concluding that the District fulfilled its child find obligation with respect to L.S. (Doc. No. 14 ("K.S. Brief") at 21–27). Ultimately, the District determined that an evaluation of L.S. was warranted at the May 8, 2017 meeting, in the aftermath of L.S.'s hospitalization for suicidal ideation. (Doc. No. 13-14 at 2). However, K.S. asserts that the District should have acted long before May 2017, as K.S. had been emailing District personnel about L.S.'s emotional difficulties and struggles with math since October 2016. (K.S. Brief at 21–22). And even if this information was not enough to prompt action, K.S. asserts that the District unreasonably determined that an evaluation of L.S. was not warranted at the February 27, 2017 meeting. (*Id.* at 25–27).

The ALJ correctly found no child find violation. To begin, L.S.'s behavior and academic performance were not sufficiently concerning in the fall of 2016 and winter of 2017 to put the

District on notice that she required special education services. During this time, L.S. had some trouble adjusting to her new school, wrote a short story with a macabre title,[4] and struggled to some degree in math. [5] Additionally, K.S. did inform school personnel that L.S. had a history of self-harm. But these signs of L.S.'s disability were not only less eye-catching than in *Jana K.*, where the court found a child find violation, but also than in *A.W.*, where the court found no violation. And it must be remembered that L.S. was new to the District in the fall of 2016, meaning that school officials did not have a baseline from which to evaluate L.S.'s behavior and performance. Given the relative mildness of L.S.'s behavior and the lack of context, the District did not violate child find by failing to act prior to K.S.'s request for an evaluation on January 31, 2017. *See D.K.*, 696 F.3d at 252 (explaining that "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities").

Similarly, the District's decision at the February 27 meeting not to evaluate L.S. for a disability does not amount to a child find violation. While the CST found that L.S. was struggling with some emotional issues, was taking Prozac for depression, and was having difficulty with math, it also noted that she was making friends and doing well at her other subjects. (Doc. No. 13-10 at 2–3). As such, the evidenced was mixed as to the existence of L.S.'s disability and her need for special education services. When confronted with mixed evidence, school districts are "not required to jump to the conclusion" that the student has a disability, as "some disabilities are notoriously difficult to diagnose and even experts disagree about whether some should be

---

[4] Based on K.S.'s briefing, one would think that "The World Painted in Blood" was a gory nightmare that should clearly have put school personnel on notice of L.S.'s emotional struggles. (K.S. Brief at 22). But as discussed above, the story contained little to no violence, and even K.S. did not seem overly concerned about it at the time, as evidenced by her amused comment about L.S.'s fixation on "dead parents" in her email to Doyle. (Doc. No. 18 at 9).

[5] Importantly, L.S. started the year relatively strong in math, posting a B in the first marking period. (Doc. No. 24-2 at 36). Although her performance declined over time, it did not reach near-failing levels until L.S. posted a D- during the third marking period. (*Id.* at 37). As such, L.S.'s academic struggles were not so severe as to the put the District on notice of her disability prior to K.S.'s request for an evaluation on January 31, 2017.

considered a disability at all."[6] *D.K.*, 696 F.3d at 249, 251. In light of this difficulty, the fact that L.S. was subsequently found to have a disability and therefore eligible for special education services does not mean that the CST's decision not to evaluate her on February 27 was improper. *See id.* at 252 (explaining that a later disability finding does necessarily mean that an earlier finding of no disability was inappropriate).

Further, the District did not simply ignore L.S. in the aftermath of the February 27 meeting. Rather, it referred L.S. to I&RS to develop an intervention plan and provided frequent counseling sessions for L.S. with Zaretsky. (Doc. No. 13-10 at 3; Doc. No. 18 at 31). Notably, it was in these counseling sessions that L.S.'s severe depression was discovered in early April 2017, resulting in her hospitalization for suicidal ideation. As such, the District was taking meaningful steps to accommodate L.S. and ensure her well-being, and these steps should not be overlooked. *See D.K.*, 696 F.3d at 252 (finding no child find violation after factoring in school district's efforts to accommodate student prior to evaluating her for a disability). Given the intangible nature of L.S.'s disability, the mixed evidence as to its existence, and the District's efforts to accommodate L.S. short of an evaluation, the Court must uphold the ALJ's determination of no child find violation.

### B.  September 12 IEP

K.S. also argues that the ALJ erred by concluding that the District provided L.S. with a FAPE because the September 12 IEP was adequate for L.S.'s educational needs. (K.S. Brief at 27–33). Because the adequacy of an IEP is a question of fact, the ALJ's finding must be considered prima facie correct. *C.S. v. Montclair Bd. of Educ.*, No. 16-3294, 2017 WL 4122433, at *5 (D.N.J. Sept. 18, 2017) (citing *Shore Reg'l*, 381 F.3d at 199). K.S. asserts the September 12 IEP was

---

[6] There is no dispute that L.S. suffers from a disability; the issue is solely whether the District should have been aware that her mental health issues amounted to a disability under the IDEA at the time of the February 27 CST meeting.

deficient because: (1) it failed to provide adequate goals for L.S.'s progress in math, (K.S. Brief at 27–28); (2) it did not provide adequate goals for L.S.'s emotional needs, (*id.* at 28–29); and (3) it did not sufficiently address L.S.' behavioral needs, (*id.* at 29–31).

K.S. exaggerates these supposed deficiencies in the September 12 IEP. With regard to the IEP's math goals, the IEP noted that L.S. was displaying particular weakness with the concepts of place value, geometry, fractions, and abstract patterns, and that she struggled with "real world" problems. (Doc. No. 13-28 at 5). Accordingly, the IEP provided L.S. with specific goals for these concepts, including being able to measure ten angles using a protractor, being able to solve "real world" problems using the coordinate plane, being able to round decimals to a given place, and being able to add fractions with unlike denominators. (*Id.* at 10). While it is easy to devise additional goals ex-post, there is no mandate that IEPs contain all possible goals. *See Coleman v. Pottstown Sch. Dist.*, 581 F. App'x 141, 147–48 (3d Cir. 2014) (affirming finding that an IEP was adequate even though it "contained only a reading goal and one incomplete math goal"); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (explaining that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal"). As such, the goals provided by the September 12 IEP were adequate to address L.S.' math education needs at the time.

The same is true of the September 12 IEP's goals for L.S.'s social and emotional needs. The IEP provided several goals on this front, including that L.S. should be able to discuss her personal qualities and verbalize how these qualities impact her self-esteem and that L.S. should be able to accurately identify her own feelings. (Doc. No. 21 at 9). K.S.'s conclusory assertions that these goals were inadequate are insufficient to justify a conclusion contrary to the that of the ALJ.

20

The same is true of K.S.'s concerns about the September 12 IEP's behavioral programming. There is no dispute that an IEP must address any behavioral issues that prevent a child from obtaining any meaningful benefit from the education provided. *New Milford Bd. of Educ. v. C.R.*, 431 F. App'x 157, 161 (3d Cir. 2011). K.S. principally argues that the ALJ underestimated the extent of L.S.'s behavior, thereby failing to appreciate the deficiencies in the IEP. (K.S. Brief at 30). Specially, K.S. asserts the ALJ erred by finding that "L.S. was not disruptive in class and did not exhibit any behaviors that interfered with the learning of others in the classroom." (HD at 68). The evidence on this point is somewhat mixed. On the one hand, there is clear evidence in the record that L.S. was exhibiting various undesirable behaviors, including being "oppositional defiant" with her teachers and appearing uninterested in class. (Doc. No. 13-10 at 2–3; Doc. No. 13-24 at 3). On the other hand, there was also testimony that L.S.'s behavior in class was generally not out of the ordinary from someone of her age and that her actions did not disturb the other students. (Doc. No. 21-2 at 27, 79–80; Doc. No. 23-1 at 39–40, 109–110). Given that there is scant evidence that L.S. was materially interfering with the learning of other students and that the ALJ recognized that L.S.'s behavior was impeding her own learning, (HD at 68), the Court cannot say that the ALJ's factual finding on this point was in error.

K.S. also argues that the September 12 IEP was inadequate even to address the behavioral issues recognized by the ALJ. On this point, K.S. relies chiefly on the testimony of her expert, Janice Kingsbury. (K.S. Brief at 29). Kingsbury testified that, based on her understanding of L.S.'s behavior in class, the September 12 IEP should have done far more to address L.S.'s behavioral needs. (Doc. No. 23-2 at 20). Yet the ALJ was not swayed by Kingsbury; while she found Kingsbury to be generally credible, the ALJ discounted her testimony because Kingsbury "relied on what was relayed to her by K.S. and L.S.," and as Kingsbury testified, "L.S. has an irrational

thought process" and "misinterprets things that are said to her and has a lot of cognitive distortions."[7] (HD at 65). There is no reason to disturb the ALJ's credibility determination with respect to Kingsbury, nor is there non-testimonial evidence in the record sufficient to reverse the ALJ's finding. *See H.W. ex rel. A.W. v. Highland Park Bd. of Educ.*, 108 F. App'x 731, 735 (3d Cir. 2004) (affirming ALJ decision that was contrary to the views of parents' expert due to the lack of non-testimonial evidence supporting the expert's position).

K.S. also contends that the ALJ erred by finding that the District was not compelled to provide an independent functional behavioral assessment ("FBA") when developing the IEP. As the ALJ discussed, the IDEA does not require the use of an FBA when crafting an initial IEP. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 80 (2d Cir. 2014); *see also D.K.*, 696 F.3d at 252 (holding that "the failure to employ a functional behavioral assessment . . . is [not] *per se* indicative of an inappropriate evaluation"). As such, a school district's failure to perform an FBA is only relevant if the IEP fails to adequately address the child's behavioral issues. *C.F.*, 746 F.3d at 80. Since the Court is unable to reverse the ALJ's finding that the September 12 IEP was adequate to address L.S.'s education needs, including her behavioral needs, it is therefore also unable to reverse the ALJ's conclusion on the need for an FBA.

### C.  Stay-Put Violation

The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). This provision, known as the "stay-put rule," is intended to preserve the status quo during disputes

---

[7] The ALJ also noted that K.S. was dependent on L.S. for her knowledge of what was transpiring at school, meaning that both of Kingsbury's primary sources of information were subject to the same flaw. (HD at 65). While Kingsbury did on one occasion observe L.S.'s behavior in the classroom herself, (Doc. No. 23-2 at 22, 25–26), the ALJ was still entitled to find that Kingsbury was mainly relying on what was conveyed to her by K.S. and L.S.

between school districts and parents over IEPs by keeping the child in her "then-current educational placement". *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014). To determine the "then-current educational placement," courts "look[] to the IEP 'actually functioning when the "stay put" is invoked.'" *Id.* (quoting *Drinker ex rel. Drinker*, 78 F.3d 859, 867 (3d Cir. 1996)). If "'the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises.'" *Drinker*, 78 F.3d at 867 (quoting *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625–26 (6th Cir. 1990)).

ALJ Tuohy correctly noted that the stay-put rule is triggered by the filing of a due process complaint. *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 492 (3d Cir. 2012). She then found that when K.S. filed her due process complaint on June 29, 2017, L.S.'s current educational placement was governed by the June 12 IEP, which the District and K.S. had agreed to implement beginning on the first day of school in September 2017. (HD at 80–81). Because the District failed to place L.S. in the pull-out replacement class for math during the 2017–18 school year, as provided by the June 12 IEP, the ALJ concluded that the District violated the stay-put rule. (*Id.*).

The ALJ's conclusion only holds up if the June 12 IEP was L.S.'s current educational placement on June 29, 2017. It was not. As the ALJ noted, the parties agreed to defer implementation of the June 12 IEP until the start of the 2017–18 school year. (Doc. No. 23-1 at 7; Doc. No. 13-22 at 2). Consequently, L.S. finished the 2016–17 school year in her general education classes and was still "placed" in general education when K.S. filed her due process complaint. Therefore, L.S.'s "current educational placement" was in general education, meaning that not only did the stay-put rule not require the District to implement the June 12 IEP, but that it actually

barred the District from doing so. *See Thomas*, 918 F.2d at 625–26 (finding that after parent filed due process complaint, stay-put rule required school district to continue providing home instruction to child with disabilities, rather than provide in-school instruction as set forth in IEP that had not yet been implemented).

Of course, the stay-put rule permits parents and school districts to agree to place the child elsewhere during the pendency of due process proceedings. In this case, the parties clearly agreed at the August 31, 2017 settlement conference that the District would provide L.S. with a one to one aide starting on the first day of the 2017–18 school year and continue providing her with individual counseling services. (Doc. No. 13-25 at 5; HD at 8). The record indicates that the District fulfilled this obligation, and there is no indication that the parties agreed to implement any other aspects of the June 12 IEP, including placing L.S. in the pull-out math class.[8] Therefore, the ALJ's conclusion that the District violated the stay-put rule must be reversed, as well as her award of compensatory education for that violation.[9]

### D.  Section 504 Retaliation

K.S. alleges that the District retaliated against her for filing for due process by refusing to implement the June 12 IEP, violating Section 504 of the Rehabilitation Act. (K.S. Brief at 37–39).

---

[8] K.S. seems to argue that ALJ Scarola ordered the District to implement the June 12 IEP at the settlement conference. (K.S. Brief at 35). K.S.'s argument appears to be based on this comment by ALJ Scarola: "It's still an initial IEP. All right, so I expect everybody will comply with that." (Doc. No. 13-25 at 7). While this comment could be read as a command to comply with the June 12 IEP, in context, it could also be read as an instruction to comply with the interim order the ALJ entered at the settlement conference. Further, this comment is certainly not the same as a formal order requiring the District to implement the June 12 IEP. And perhaps most importantly, it is unclear by what legal authority ALJ Scarola could have ordered implementation of the June 12 IEP. Although the transcript of the settlement conference is vague and confusing, it at no point shows the District agreeing to implement the June 12 IEP, nor does it even show K.S. clearly requesting that the IEP be implemented. As such, the Court remains convinced that the District was bound by the stay-put rule to keep L.S. in general education classes during the 2017–18 school year.

[9] K.S. argues that the District denied L.S. a FAPE because it did not make either the June 12 or September 12 IEPs available to her teachers and personal aides, causing them to be unaware of L.S.'s special educational needs. (K.S. Brief at 32–33). But as discussed above, the District was barred from implementing the June 12 IEP by the stay-put rule, and also could not implement the September 12 IEP because K.S. never consented to it. As such, this argument fails.

Before the Court can reach the merits, it must consider whether it has subject-matter jurisdiction to hear this claim, which requires determining whether K.S. has properly exhausted her administrative remedies.

The IDEA requires aggrieved parties to exhaust the state's administrative procedures before bringing an IDEA claim in federal court. *Jeremy H. ex rel. Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 281 (3d Cir. 1996). Further, "[e]xhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (citing 20 U.S.C. § 1415(*l*)). As such, the exhaustion requirement is triggered when "a lawsuit seeks relief for the denial of a free appropriate public education." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 754 (2017); *see Batchelor*, 759 F.3d at 274–75 (finding that the IDEA required exhaustion of Section 504 retaliation claims that clearly related to the school district's provision of a FAPE); *M.A. v. Jersey City Bd. of Educ.*, 592 F. App'x 124, 130–31 (3d Cir. 2014) (affirming dismissal of Section 504 retaliation claim when parents failed to raise before the ALJ any claim that school retaliated against them for bringing IDEA litigation). The exhaustion requirement is jurisdictional. *Batchelor*, 759 F.3d at 272.

K.S. does not dispute that her Section 504 retaliation claim clearly relates to the District's provision of a FAPE for L.S. Rather, she asserts that she did exhaust her Section 504 claim during the OAL proceedings by raising it in her closing brief submitted to the ALJ. (K.S. Reply at 17–18). K.S. is incorrect; in order to meet the exhaustion requirement, she needed to "raise the *allegations* related to her Section 504 claim in an IDEA complaint submitted to an IDEA hearing officer." *S.S. ex rel. Street v. Dist. of Columbia*, 71 F. Supp. 3d 1, 6 (D.D.C. 2014) (citing *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1159 (11th Cir. 2006) (finding that parents did not

exhaust retaliation claim because they never requested a due process hearing for it specifically, even though they raised the retaliation claim at other IDEA due process hearings)). Upon examination, neither K.S.'s initial due process complaint (Doc. No. 20) nor her amended complaint (Doc. No. 22) contain the allegations underlying her Section 504 retaliation claim.[10] Because the exhaustion inquiry hinges on the contents of the due process complaint, not subsequent briefing, K.S. has not exhausted her Section 504 claim, and thus the Court lacks subject-matter jurisdiction to consider it.[11]

## V.    CONCLUSION

As discussed above, the ALJ correctly determined that the District satisfied its child-find obligation and that the September 12 IEP was reasonably calculated to provide L.S. with a FAPE but erred in concluding that the District violated the IDEA's stay-put rule. Further, K.S. has not exhausted her administrative remedies with respect to her Section 504 retaliation claim, and thus cannot present it to this Court. Therefore, the District's Motion for Summary Judgment is **GRANTED** and K.S.'s Motion for Summary Judgment is **DENIED**; ALJ Tuohy's decision is **AFFIRMED IN PART** and **REVERSED IN PART**. An Order follows.


Dated:  6/3/2020                                          /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge

---

[10] K.S. argues that she only learned that the District was retaliating against her after the start of administrative proceedings, during Zaretsky's testimony, and that therefore her failure to allege retaliation in her due process complaint should be excused. (K.S. Reply at 18). This argument is unpersuasive for two reasons. First, there was nothing stopping K.S. from filing a separate due process complaint concerning her allegations of retaliation. *See* 20 U.S.C. § 1415(*o*) ("Nothing in this section shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed."). Second,  K.S. could have attempted to amend her due process complaint to add the retaliation claim. The New Jersey administrative procedure rules provide that "pleadings may be freely amended" without any explicit time limitation. N.J.A.C. 1:1–6.2. Notably, Zaretsky gave the relevant testimony on January 12, 2018, (Doc. No. 23-1 at 8), almost a full year before K.S. submitted her closing brief on December 21, 2018 (Doc. No. 23), meaning that K.S. had adequate time to seek to amend her complaint before her brief was due.
[11] K.S. does not argue that any of the exceptions to the IDEA's exhaustion requirement apply, and so the Court does not consider them.